UNITED STATES of America,
Plaintiff,

v.

Nicholas PEÑA–GONZALEZ
(03); Defendant.

No. Crim. 97–284(JAF).

United States District Court,
D. Puerto Rico.

July 7, 1999.

Asst. U.S. Attorney Stephen Muldrow Guillermo Gil, U.S. Attorney San Juan, PR, for plaintiff.

Rafael Anglada–Lopez, San Juan, PR, William D. Matthewman, Miami, FL, for defendant.

## OPINION AND ORDER

FUSTE, District Judge.

Defendant, Nicholas Peña–González, has been charged with a drug trafficking conspiracy in violation of 21 U.S.C. § 846 (Count I), conspiracy to commit firearms murder in relation to the drug trafficking conspiracy in violation of 18 U.S.C. § 924(o) (Count II), and firearms murder in relation to a drug trafficking offense in violation of 18 U.S.C. §§ 924(j) (Count III) Defendant moves to strike the death penalty certification in his case pursuant to 18 U.S.C. § 3005; Local Rule 428; Fed. R.Crim.P. 12; and the Fourteenth Amendment, U.S. CONST., amend. XIV.

## I.

### Relevant Factual Background

On July 28, 1998, Defendant initially appeared. On July 30, 1998, we appointed attorney Thomas R. Lincoln to represent him. *Docket Document No. 130.* At his arraignment on that same day, Defendant pled not guilty to Counts I, II, and III of the indictment. The following day, Defendant moved for appointment of counsel in a capital case. *Docket Document No. 131.*

On August 28, 1998, we ordered the Assistant United States Attorney to inform us which of the Defendants charged in the conspiracy were going to be recommended for death penalty certification. *Docket Document No. 131.* After receiving the Prosecution's response that it was not recommending capital certification for Defendant Peña–González, we denied Defendant's motion on September 1, 1998. *Docket Document No. 131.*

On November 3, 1998, Defendant filed a motion for his appointed counsel, Mr. Lincoln, to withdraw because of a difference of opinion. *Docket Document No. 170.* As a result, on December 9, 1998, we ordered Mr. Lincoln to respond to us regarding Defendant's motion for his withdrawal before December 20, 1998. *Docket Document No. 170.* During this period, the Department of Justice ("DOJ") filed an Informative Motion requesting that all death penalty eligible Defendants, including Defendant Peña–González, provide a mitigation submission in preparation for the certification hearing. *Docket Document No. 175.*[1] As a result of the differences in opinion between Defendant and his appointed counsel and the complete lack of a working attorney-client relationship, Mr. Lincoln never filed a mitigation submission and did not attend the certification hearing. On December 17, 1998, the Attorney General certified that she would seek the death penalty against four Defendants, including Peña–González. *Docket Document No. 183.* On December 18, 1998, Defendant filed another motion for the withdrawal of Mr. Lincoln. *Docket Document No. 185.* We granted the motions for Mr. Lincoln's withdrawal on December 21, 1998. *Docket Document No. 185.* On December 23, 1998, we appointed Rafael Anglada–López as local counsel and William Matthewman as learned counsel for Defendant. *Docket Document No. 190.*

Defendant alleges that (1) he was denied learned death penalty counsel, and effectively any counsel, prior to and at the meeting in which the DOJ certified his case for capital punishment in violation of 18 U.S.C. § 3005 and Local Rule 428, and (2) the failure to have learned counsel before the DOJ committee violated his due process rights and caused him irreparable harm.

1. This is standard procedure in capital punishment eligible cases. Section 9–10.000(C) of the *United States Attorneys' Manual* directs U.S. Attorneys to submit a "Death Penalty Evaluation" form and prosecution memorandum regardless of whether or not the U.S. Attorney intends to seek capital certification.

The Prosecution responds that: (1) even assuming a violation of 18 U.S.C. § 3005 and Local Rule 428, striking the death penalty is not an appropriate remedy; (2) the Attorney General's decision to authorize death penalty certification is an exercise of prosecutorial discretion under an internal DOJ policy guideline which does not confer any rights upon potential capital defendants; and (3) even assuming Defendant suffered some harm in not having learned counsel during the DOJ committee process, the harm is not irreparable since Defendant's learned counsel can, at any time prior to trial, request reconsideration of the DOJ decision.

## II.

### Capital Cases Generally

The consideration of whether to permit the government to go forward with its proceedings for certification entails the unique gravity appropriate for capital cases. Capital punishment is qualitatively different from any other form of criminal penalty we may impose. *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). With it, we deny the convict any possibility of rehabilitation and order instead his execution, the most irrevocable of sanctions. *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Its severity demands a heightened need for reliability in the determination that death is the appropriate punishment in a specific case. *Caldwell v. Mississippi*, 472 U.S. 320, 323, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (citing *Woodson*, 428 U.S. at 305, 96 S.Ct. 2978). We must be, therefore, particularly sensitive to insure that unique safeguards are in place that comport with the constitutional requirements of the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment. *Gregg*, 428 U.S. at 187, 96 S.Ct. 2909.

## III.

### Certification of Capital Cases

Under the Local Rules, capital cases have specific standards regarding the appointment of defense counsel, and precise requirements as to what learned counsel must accomplish to dissuade the Attorney General from seeking the death penalty. These rules are found in 18 U.S.C. § 3005 and 21 U.S.C. § 848(q)(4). Section 3005 of 18 U.S.C., as amended by § 60026 of the 1994 Act, provides:

> [w]hoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign two such counsel, of whom at least one shall be learned in the law applicable to capital cases....

18 U.S.C. § 3005 (1994). Section 848(q)(4) of 21 U.S.C. states:

> Notwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation ... shall be entitled to the appointment of one or more attorneys.

21 U.S.C. § 848(q)(4).

Moreover, all capital cases in the District of Puerto Rico must abide by the provisions of Local Rule 428. As the DOJ requires certain administrative protocol to be followed in capital cases, Local Rule 428 necessitates that prosecutors file a Certificate of Death Penalty Case in any case in which the maximum possible penalty is death. Local Rule 428(2)(A). A prosecutor's notice of his intent to seek the death penalty will trigger certain rights under the Local Rules regarding the appointment of defense counsel and case management.

Indeed, the appointment of specially-qualified counsel constitutes the greatest block to a fast switch to a death penalty case. Specifically, a second attorney must

be appointed to a capital defendant to join local counsel in preparing to make the submission to the DOJ. At least one attorney must be learned in the law applicable to capital cases and, when applicable, qualified according to 21 U.S.C. § 848(q)(5) or 848(q)(6). *See* Local Rule 428(3)–(5). To be eligible for appointment as learned lead counsel, an attorney must:

(A) be a member of this court, or be admitted to practice pro hac vice on the basis of his or her qualifications;

(B) have at least five years experience in the field of federal criminal practice;

(C) have prior experience, within the last three years, as defense counsel in the trial of no fewer than three serious and complex felony cases that were tried to completion in federal court, and have prior experience, within the last three years, as defense counsel in a capital case; and

(D) have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to the defense of capital cases.

## IV.

### Attorney General's Hearing

The Attorney General's hearing requires many elements of preparation, each of which is time-consuming. Once the defendant is charged with an offense subject to the death penalty, or before the prosecution decides to request approval to seek the death penalty, the DOJ must give defense counsel a "reasonable opportunity to present any facts, including mitigating factors, to the United States Attorney for consideration." *January 27, 1995, Memorandum from Janet Reno, ¶ B, Federal Prosecutions in Which the Death Penalty May Be Sought.* In presenting the case that a sentence of death is not justified, defense counsel must carefully investigate and argue the mitigating factors listed in 18 U.S.C. § 3592 and 21 U.S.C. § 848(m).

These factors include, but are not limited to: impaired capacity; duress; minor participation; equally culpable defendants; prior criminal record; mental or emotional disturbance; victim's consent; grave risk of death to additional persons; heinous, cruel or depraved manner of committing offense; procurement of offense by payment; pecuniary gain; substantial planning and premeditation; vulnerability of the victim; and use of a firearm. 18 U.S.C. § 3592(a)–(d); 21 U.S.C. § 848(m).

## V.

### Defendant Peña–González' Motion

Defendant Peña–González' motion essentially entails a three-step inquiry: (1) whether the Sixth Amendment right to counsel extends to death penalty certification hearings;[2] (2) whether Defendant's constitutional rights were violated; and (3) if so, what is the appropriate remedy.

### A. Right to Counsel

■ The Sixth Amendment guarantees to all criminal defendants the right "to assistance of counsel for [their] defense." U.S. Const. amend. VI; *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Supreme Court stressed that "the right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel," because even "intelligent and educated laymen" require "the guiding hand of counsel" to comprehend adequately the intricacies of the law. *Id.* at 69, 53 S.Ct. 55; LaFave and Israel, Criminal Procedure, vol. 2, § 11.1(a) at 4; *see also Johnson,* 304 U.S. at 462, 58 S.Ct. 1019 (noting that the Sixth Amendment "embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself" in a criminal prosecution). The right to coun-

---

**2.** As we find that Defendant was denied the right to counsel at his death penalty certification hearing, we need not explore whether he had a right to learned counsel.

sel "withholds from the federal courts, in all criminal proceedings, the power and authority to deprive an accused of his life or liberty unless he has or waives the assistance of counsel." *Id.* at 463, 58 S.Ct. 1019. The right to counsel attaches the moment an individual becomes "accused" within the meaning of the U.S. Constitution. *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

█ The right to counsel derives out of notions of due process and the state's obligation to provide a fair hearing. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (noting that "effective assistance of counsel" necessarily incorporates the "purpose [of the constitutional requirement]—to ensure a fair trial"). The *Powell* Court noted that the right to counsel may extend beyond the criminal prosecution itself where the procedure was a "logical corollary" of the right to counsel. *Powell,* 287 U.S. at 71, 53 S.Ct. 55. In *Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), the Court extended the right to counsel by holding that "appointment of counsel for an indigent is required at every stage of a criminal proceeding where the substantial rights of a criminal accused may be affected." *See also United States v. Wade,* 388 U.S. 218, 226–27, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (right to counsel extends to any stage of the proceedings where counsel's absence might derogate from the right of the defendant to a fair trial); *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). As a result, the right to counsel has been extended to many pre– and post-trial situations. *See, e.g., Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (right to counsel at court–ordered psychiatric examinations); *McConnell v. Rhay,* 393 U.S. 2, 89 S.Ct. 32, 21 L.Ed.2d 2 (1968) (right to counsel at revocation of probation proceedings); *Arsenault v. Massachusetts,* 393 U.S. 5, 89 S.Ct. 35, 21 L.Ed.2d 5 (1968) (right to counsel at preliminary hearings); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (right to counsel on appeal); *Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) (right to counsel at some arraignments); *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) (right to counsel at sentencing). The right to counsel has also been held to be retroactive in many situations since the "denial of the right must almost invariably deny a fair trial." *Arsenault,* 393 U.S. at 6, 89 S.Ct. 35 (citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)) (at trial); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (on appeal); *Hamilton,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (at "critical" stages of criminal proceedings). Furthermore, claims involving fundamental rights are within the control of the client, rather than the attorney, and thus require consultation before pursuit of a particular avenue. *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

█ A complete denial of representation is similar in kind but different in magnitude to an ineffective assistance of counsel claim. They are similar in that egregious instances of ineffective assistance of counsel often involve the complete abdication of a defense. *See, e.g., Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (stating that "courts are concerned that counsels' decisions reflect 'informed, professional deliberations' rather than 'inexcusable ignorance or senseless disregard of their clients, rights' ") (internal citations omitted). However, the main difference between the two lies in the fact that there are a small number of "structural" constitutional errors which require automatic reversal, of which the total deprivation of right to counsel is one. *Chapman v. California,* 386 U.S. 18, 23 & n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (suggesting in dictum that the right to counsel is so basic to a fair trial that its violation can never be

harmless); *Gideon v. Wainwright*, 372 U.S. at 335, 83 S.Ct. 792. These "structural" errors are specific, and unacceptable, flaws in the trial procedure which affect the outcome of the trial.[3] The Supreme Court's recognition of these procedural errors reflects the reality that the Court places the utmost importance on accurate fact-finding in criminal prosecutions in accordance with the presumption that fair process is one of the best guarantors of substantial justice. Additionally, when a total abdication of counsel during all or parts of criminal trials occurs, it is a complete denial of the right to counsel which authorizes courts to grant relief without a showing of prejudice. *Tucker v. Day*, 969 F.2d 155 (5th Cir.1992) (counsel failed to do anything at resentencing hearing); *Javor v. United States*, 724 F.2d 831 (9th Cir.1984) (counsel slept through the majority of the trial).

■ Therefore, the inquiry which we need to make is whether the right to counsel attaches at death penalty certification hearings. We find that it does. First of all, it is undisputed that a capital punishment certification hearing is a "critical" stage of a criminal proceeding where the "substantial rights of a criminal accused may be affected." *Mempa*, 389 U.S. at 134, 88 S.Ct. 254. In fact, it is of paramount importance in a capital case. Death penalty certification involves the most fundamental of the rights, the right to life, and, therefore, the client, not the attorney, is the appropriate party to make strategic decisions. *Jones*, 463 U.S. at 745, 103 S.Ct. 3308. Nonetheless, the learned hand of counsel should be assisting the client during this crucial process.

A somewhat analogous situation is an adult certification hearing in which a court determines whether to try a juvenile as an adult. The situations are analogous in that neither is a trial nor an adversarial proceeding by nature. Rather, both function to make a status determination prior to trial. *See generally, Harris v. Procunier*, 498 F.2d 576 (9th Cir.1974). The Supreme Court has held that a juvenile's due process rights include the right to counsel, adequate notice, and a statement of the reasons for the determination. *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). The Court based its holding on the philosophy of social welfare, rather than the corpus juris. *Id.* at 554, 86 S.Ct. 1045. The purpose of the proceeding is to determine the respective needs of the child and of society, not to adjudicate criminal conduct. *Id.* In the decision, the Court noted that the "determination of whether to transfer a child from the statutory structure of the Juvenile Court to the criminal processes of the District Court is 'critically important.' " *Id.* at 560, 86 S.Ct. 1045. It is a logical extension of this analysis, to conclude that due process also requires that the right to counsel applies to death penalty certification hearings. Like the adult certification hearings, the purpose of a death penalty certification hearing is not to adjudicate guilt, but rather to determine the interests of the defendant and society. Since certification can result in death, it is irrefutably of "critical" importance.

Moreover, the DOJ guidelines for federal prosecutions in which the death penalty may be sought explicitly anticipate the participation of defense counsel prior to and at the certification hearing. *January 27, 1995, Memorandum from Janet Reno, ¶ B, Federal Prosecutions in Which the Death Penalty May Be Sought*, amending § 9–10.000(D) of the *United States Attorney's Manual* ("Counsel for the defendant shall be provided an opportunity to pres-

---

**3.** The structural defects are: Lack of an impartial judge, *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); denial of right to self-representation at trial, *McKaskle v. Wiggins*, 465 U.S. 168, 177–178, n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); denial of the right to a public trial, *Waller v. Georgia*, 467 U.S. 39, 49, n. 9, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); and the exclusion of members of a defendant's race from a grand jury. *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986).

ent to the Committee, orally or in writing, the reasons why the death penalty should not be sought."). Additionally, the DOJ adopted its guidelines in order "to promote consistency and fairness." *Id.* at § 9–10.000(G). Therefore, the purposes of the guidelines contemplate procedural due process considerations and due process, which logically encompasses the right to counsel.

We are unpersuaded by the Prosecution's assertions that Defendant's due process rights are not inherent at the death penalty certification hearing. Our reasons for this are tri-fold. First, as we previously enunciated, capital punishment certification is undoubtedly a pivotal and enormously important moment in any criminal prosecution. The hearing can literally lead to a determination of life or death. At such a "critical" stage, we find that the right to counsel necessarily attaches. *Coleman,* 399 U.S. at 1, 90 S.Ct. 1999. Secondly, since the right to counsel is grounded in procedural due process, we find that the complete abdication of counsel at a death penalty certification hearing is, concomitantly, a denial of the defendant's due process rights. *Powell,* 287 U.S. at 71, 53 S.Ct. 55. Third, we garner support for this determination from the Department of Justice's own internal policies which clearly foresee the right to counsel at death penalty certification hearings. *January 27, 1995, Memorandum from Janet Reno,* ¶ *B, Federal Prosecutions in Which the Death Penalty May Be Sought,* amending § 9–10.000(D) of the *United States Attorney's Manual.*

## B. *Constitutional Violation*

■ We next determine whether Defendant's right to counsel at his death penalty certification hearing was violated.

In the interest of conserving federal resources and avoiding unnecessary work, we declined to appoint Defendant learned counsel upon the Prosecution's assurance that it was not seeking death penalty certification for Defendant Peña–González.

Upon being informed of the Attorney General's certification, taken without the Prosecution's recommendation and received with surprise by both the Prosecution and this court, we immediately appointed Defendant new local counsel and learned counsel. Nonetheless, during this period, due to conflicts with his appointed counsel, Defendant was not being represented by any counsel. Defendant was denied the assistance of counsel in preparing his mitigation submission to the DOJ committee and in deciding whether or not to be represented at the certification hearing. The inescapable reality of the situation is that Defendant was denied his right to counsel at a "critical" stage of his criminal prosecution—the determination of whether or not to seek the death penalty. As the Supreme Court stated:

> The right to representation by counsel is not a formality. It is not a grudging gesture to a ritualistic requirement. It is of the essence of justice. Appointment of counsel without affording an opportunity for hearing on a 'critically important' decision is tantamount to denial of counsel.

*Kent,* 383 U.S. at 561, 86 S.Ct. 1045. Defendant was denied this constitutional right. *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) (stating that "[t]he constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate in behalf of his client, as opposed to that of amicus curiae … [h]is role as an advocate requires that he support his client's appeal to the best of his ability").

## VI.

### *Appropriate Remedy*

Since we have found that Defendant Peña–González was denied his right to counsel at his death penalty certification hearing, we now turn to the determination of the proper remedy for such a violation.

We begin with a fundamental principle of our jurisprudence, *ubi jus ibi remedium*—where there is a right there is a remedy. This axiomatic principle forms the bedrock of our system of justice. The necessary corollary is that a right without a remedy is no right at all. Therefore, courts generally adhere to the "maxim that every right has a remedy, and that where the law does not give redress, equity will afford relief." *Knight v. Town of Glocester,* 831 F.2d 30, 32 (1st Cir.1987).

█ In the case of a constitutional violation, courts are duty-bound to construct an effective remedy tailored to the injury. *Milliken v. Bradley,* 418 U.S. 717, 744, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) ("[T]he scope of the remedy is determined by the nature and extent of the constitutional violation."); *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The denial of the right to counsel is one of the most fundamental violations of our trial system which constitutes an error that is never harmless. *Chapman,* 386 U.S. at 23 & n. 8, 87 S.Ct. 824. Such a grave violation merits an equally weighty remedy. *Cf. United States v. Watson,* 496 F.2d 1125 (4th Cir. 1973) (court's failure to immediately appoint learned counsel in compliance with 18 U.S.C. § 3005 could lead to reversal of conviction).[4]

█ In this case, we find that striking the death penalty certification is appropriate. No other remedy sufficiently cures this violation. Statistics show that the Attorney General seeks the death penalty in approximately one of every five eligible cases.[5] However, the Attorney General withdraws a decision to seek the death penalty in approximately one out of every ten reconsideration cases.[6] Thus, Defendant's denial of the right to counsel at the certification hearing resulted in a shift from an 80% chance of not being certified to a 10% chance of becoming decertified. Therefore, effective assistance of counsel at the reconsideration hearing is an inadequate remedy because Defendant's likelihood of becoming decertified are poor at best. In the capital punishment context, we find Defendant's right to counsel violation and its concomitant statistical reality mandate decertification.

Despite having carefully considered the Prosecution's arguments, we find Defendant's constitutional right to counsel trumps any notion of punishment the Prosecution will suffer. Additionally, as we find that Defendant possessed due process rights during the Department of Justice certification hearing, we find the Prosecution's assertion of the Attorney General's prosecutorial immunity unpersuasive. In fact, in the very case the Prosecution uses to support this contention the district court acknowledges that:

> [t]he Attorney General's actions undertaken within her prosecutorial discretion are only *presumptively unreviewable:* review still may be had in circumstances where the relevant substantive statute limits [the Department of Justice's] discretion by providing guidelines for the agency to follow in the exercise of its discretion, or, in certain cases, *where meaningful and judicially manageable standards otherwise available provide the court with law to apply.*

*Walker v. Reno,* 925 F.Supp. 124, 128 (N.D.N.Y.1995) (emphasis added). We find such a situation to be present. Defendant suffered from denial of his right to

---

4. We note that when *Watson* was decided § 3005 required "immediate" appointment of counsel, while the current statute requires "prompt" appointment. Nevertheless, this language substitution does not affect our reasoning.

5. Subcommittee on Federal Death Penalty Cases Committee on Defender Services, Judicial Conference of the United States, *"Federal Death Penalty Cases": Recommendations Concerning the Cost and Quality of Defense Representation,* pp. 5, 7 (May 1998).

6. *Id.* We note that the reconsideration hearing is a second look at the prior certification and not a *de novo* hearing.

counsel. Such a violation provides "meaningful and judicially manageable standards" for us to apply. Finally, as discussed *supra*, a reconsideration hearing is a poor substitute for the first shot at not being certified.

## VII.

### *Conclusion*

In keeping in line with "attempts to preserve, protect, and to make meaningful the Constitutional rights and privileges which are afforded free citizens in a free society," *Arsenault*, 393 U.S. at 6, 89 S.Ct. 35 we **GRANT** Defendant Peña–González' motion to strike the death penalty certification in his case. In so doing, we note that this is in no way a reflection upon the work of the U.S. Attorney's Office in Puerto Rico in the handling of this matter. Both the U.S. Attorney's Office and this court were under the assumption that capital punishment certification would not be sought for Defendant. Therefore, upon the Attorney General's subsequent certification, all parties responded accordingly. This disposition is simply the best remedy to Defendant's constitutional violation.

We also **RELEASE** Mr. Matthewman from further representing Defendant Peña–González as learned counsel. He should file his final Criminal Justice Act vouchers for this case.

**IT IS SO ORDERED.**